\* W. W. BOOMER et al. v. ALEXANDER GIBBS.

*Action for Delivery of Land—Survey—Overlapping Boundaries—Adverse Possession of Lappage.*

1. Positive proof of the location of a corner called for in a grant will control course and distance, but where the evidence leaves in doubt the actual site of the corner it is the duty of the jury to be guided by what is, in that event, the more certain description—the course and distance.

2. The test of the sufficiency of possession of land to mature title is the liability of the occupant to an action of trespass in ejectment.

3. Where the boundaries of two grants or deeds lap upon each other the constructive possession of his entire boundary remains in him who has the better title, even without any actual possession whatsoever, until the claimant under the junior grant occupies the lappage.

4. Possession of part of the lappage by the one having the inferior title gives constructive possession of the whole lappage so long as the one having the better title has not actual possession of any part.

CIVIL ACTION for title and possession of land, tried at the Fall Term, 1892, of the Superior Court of HYDE County, before *Hoke, J.*

The plaintiffs deraigned title through—

First, grant to William Watson, dated October 2, 1817; second, will of William Watson devising one-half of the land covered by the patent each to his sons, Augustus and James M. Watson; third, deeds of James M. Watson to plaintiff, W. W. Boomer, dated February, 1873, and of Augustus Watson to plaintiff, Riley Murray, dated August, 1852, conveying their respective interests in the land embraced within the limits of the patent, which it is admitted covers the *locus in quo.*

* SHEPHERD, C. J., did not sit on the hearing of this case.

BOOMER v. GIBBS.

The defendant relied upon two defences: First, that the *locus in quo* was covered by a grant to John Gray Blount, dated November 26, 1799; second, upon possession under a deed from Eli Smallwood to Thomas Gibbs, dated November 26, 1849, and the will of said Thomas Gibbs, dated in 1854, devising said land to the defendant, Alexander Gibbs.

The map exhibited on the trial was as follows:

Joseph H. Wahab, a witness for both plaintiff and defendant, testified as follows, to-wit: "I am a surveyor; made a

survey of the lands in dispute under an order of the Court, and made the plats in this case. The point I on the map was pointed out to me in the presence of both parties as the 'westernmost back corner of the Weston Long patent,' the point 7 as the south-west corner of the William Carrowan patent, and the point 8 as the south-east corner of the same patent. I do not know where the Indian stake on Pamlico Sound is, nor did I run from there to the head of Juniper Bay at the James English landing. Both parties were present and there was no dispute as to the location of the James English landing. I located the Z on the map as the beginning of the 150-acre Turner patent, and the T as the south-west of the 640-acre Turner patent; ran from Z to T, then up the line of Turner's patent to a point X, which would be 200 poles from Turner's north-west corner (X) by platting the same; then I ran west 220 poles or thereabouts to English's ditch, which I struck at the point U; then I ran up the road and the 750 poles would give out at V. This point is 176 poles from where the lake is now; that is, from the water of the lake. The point A on the map is 160 poles from the place that was shown me as where the old Blount road went into the Juniper Bay road. There was a sign of the old Blount road there at that time. The point W is 160 poles from a place that was shown me that a poplar used to stand. This is at the head of the Juniper Bay road as it now is. W is about four chains north of A. I did not run any of the other lines of the Blount grant, but from my knowledge of the location of the grant the other lines called for would close in to the beginning.

"The point T on the map is the south-west corner of the Reuben Benson land, and the point called for as such in the deed from Eli Smallwood to Thomas R. Gibbs; thence eastwardly to the south-east corner of the said tract I ran to the point which is the south-east corner of the William Car-

rowan land, and is also one of his south-east corners; then I turned and ran north to the point 1, which is also a Benson corner and the corner of the Weston Long patent in the Carrowan patent; then I turned eastwardly and ran along the Weston Long patent to the point south, which was pointed out to me as one of John Benson's corners. I ran the line A, 8, B on the map. I found nothing at B; at 8 I found a stone, and this is known as one of Benson's corners and the south-east corner of the Carrowan patent. If Blount's line stopped at A and then ran to B, then Blount's line would pass through the point 8. If you run north to the point V, at the end of the 750 poles, there would be no Benson corner in any of the Blount lines which run eastwardly, nor would there be if you stopped at the point W and then ran east the calls of the Blount grant. Reuben Benson lived on the Selby patent, and on neither the Carrowan nor Weston patent. If the point T is the south-west corner of the land on which Reuben Benson lived, then the point 8 would be the south-east or one of the southern corners.

"I do not know where Sam Weston's house on the lake where he formerly lived is situated. I know where Bluff Bay is situated. If the Smallwood deed runs eastwardly to the Juniper Bay by ditch and thence up to the stone at T, which is Benson's south-west corner; thence eastwardly to 8; thence up to I; thence eastwardly to S, as the south-east corner of the John Benson land, and thence southwardly to Bluff Bay, it will include the *locus in quo*. If Smallwood's deed to Gibbs stops at T and then runs to 8 and eastwardly to B, it would not include the *locus in quo*. Martin lived outside of the patent and towards the lake."

The witness further testified that he surveyed the Smallwood deed from Benson's south-west corner at T, and then to 8, and then to 1, and then to S, which was pointed out

to him as the south-east corner of the John Benson land at a point on the Weston Long patent; that he did not make any actual survey east of that point; that he did not know where the Samuel Weston house was built, but that he knew where Bluff Bay was and the other points called for in the Smallwood deed south of this point S, and from such knowledge testified that the remaining lines of the Smallwood deed would close up and embrace the *locus in quo.*

The other facts connected with the trial are stated in the opinion of Associate Justice AVERY.

There was verdict and judgment for the defendant, and plaintiffs appealed.

*Mr. W. B. Rodman,* for plaintiffs (appellants).
*Mr. L. C. Latham,* for defendant.

AVERY, J.: The land in controversy is included within the lines indicated on the map by the letters and figures 8, I, D, C, B to 8, and the first question raised by the testimony was whether the limits of the John Gray Blount patent extended north to V and then ran south 82 east so as to include the *locus in quo,* or no further north than A, so that the next line would run south of it to B. The call of the patent which gave rise to the dispute was, "Then with the same (English's ditch just previously mentioned as the terminus of the line running west 220 poles) and the road northwardly seven hundred and fifty (750) poles to a point 160 poles from the lake along the road." If the point A had been shown by undisputed testimony or had been admitted to have been 160 poles from the margin of the lake and along the road mentioned when the survey was made under which the grant was issued, such positive proof would have controlled course and distance and established the location of the corner at A, though less than 750

poles from the last station. *Strickland* v. *Draughan*, 88 N. C., 315. But as the testimony was conflicting it was the province of the jury to determine whether the corner was satisfactorily shown to have been originally located at A, and if, in their opinion, the actual site of that corner was left in doubt by the evidence, it was their duty to be guided by what would in that event be the more certain description—the course and distance. This controverted question of fact was therefore properly submitted to the jury with appropiate instruction for their guidance. *Marsh* v. *Richardson*, 106 N. C., 539; *Dobson* v. *Whisenhant*, 101 N. C., 645; *Jones* v. *Bunker*, 83 N. C., 324; *Redmond* v. *Stepp*, 100 N. C., 212; *Spruill* v. *Davenport*, 1 Jones, 203.

If the Blount patent issued in 1799 covered the land in dispute an older outstanding title was shown than the grant to Watson in 1817, and the plaintiff could not recover. But in case the jury fixed the location of the disputed corner of the older patent at A it became necessary for the defendant to fall back on his second ground of defence—that he and those under whom he claimed had acquired title by possession under the deed of Smallwood to Thomas Gibbs in 1849, and the devise of Thomas Gibbs to the defendant in 1854, as color. The boundary of the grant to William Watson is admitted to be correctly indicated on the map by the lines 1, 2, 3, 4, 5, 6, 7, 8, I, and to include the *locus in quo*, and if the Blount patent was bounded on the north by the line A B it did not cover the disputed territory. The calls of the Smallwood deed, which gave rise to the controversy as to the location of its boundaries, were as follows: " Then (viz., from the south-west corner of the Reuben Benson tract where he formerly lived) with Benson's line to his south-east corner of his said tract, now John Benson's; then eastwardly with the line of the John G. Blount 10,240-acre grant, to a stake, 150 poles from Sam

Weston's (deceased) house, where he formerly lived, on the lake; then south to the West Bluff Bay; then down said bay to the sound." It was admitted that Reuben Benson's south-west corner was at a point indicated on the map by the letter T and that the next calls were properly run to 7 and 8, and the defendant contended that the "stake 150 poles east of Sam Weston's house" was located at 1, and that the boundary extended then to S so as to include the *locus in quo* (by running to the other points called for) within the bounds of the Smallwood deed—while the plaintiff insisted and asked the Court to instruct the jury, that there was no testimony tending to show where the stake called for was located, and that consequently the true line was from 8 to B instead of to 1, thus locating the northern boundary of the Smallwood deed south of the disputed land at 8 to B instead of along the line I to S. The surveyor Wahab had testified, without objection, that while he did not know where the Samuel Weston house was built he knew where Bluff Bay was, and "*the other points called for in the Smallwood deed south of the point S, and from such knowledge that the remaining lines of the Smallwood deed would close* up and embrace the *locus in quo.*" It does not appear that the plaintiff's counsel examined the surveyor so as to test the grounds of his opinion before the jury. Without further inquiry as to the manner of acquiring a knowledge of the location of the remaining corners the jury might fairly have drawn the inference that the surveyor knew, from sources satisfactory to him, where the point of intersection with Bluff Bay was, and had demonstrated the fact, by surveying and plotting, that only a line run southwardly from 1 to S would fill the description of both calls first "with the line of the John G. Blount 10,240-acre survey," and then southwardly to the known corner on the bay. Upon this point the Court refused the request of the

plaintiff to instruct the jury that there was no testimony to show the location of the stake, and instructed them, among other things, as follows:

"Defendant contends that the true location of the deed calling for the Benson line to his south-east corner of his said tract, now John Benson's, runs from T to 7; then to 8; then to 1; then along the line of the Weston Long patent to the point 8, and then to close in the lines of the deed, in which case it would include the land in controversy.

"Now, if the jury are satisfied, from the evidence, that the Benson line called·for in the Smallwood deed runs to 7, to 8, then north to 1, and then along the Weston Long patent to 8; if the point 8 was the south-east corner of the Benson land called for in the Smallwood deed and the line approaching it and called for in such deed was along the Weston Long patent from 1 back to 8, to 7 and then to T, being a known and visible line, then the possession of defendant in such deed and in the Watson grant for the seven consecutive years would mature their title to such boundary.

"And this would be true were the said possession, was the south land, marked in plat, 'Land in dispute.'"

The Court here recited all the evidence, and stated the position of parties on this point and referred to call in deed for running easterly with the Blount line as evidence and circumstances on location, telling the jury the occupation of defendant of land in dispute since 1867 was not sufficient to ripen title, because of the suit of plaintiff in 1876, and that the time from May 20, 1861, to January 1, 1870, would not be counted.

The Judge evidently submitted the question of location to the jury in view of the surveyor's testimony taken in connection with the call in the deed for running with the line of the Blount survey, and we think, for the reasons

given, that there was no error in so doing. In addition to the evidence of Wahab it appears also that another surveyor, George W. Swindell, testified without objection that Marshall Swindell had pointed out the place indicated by S on the map as a corner of the Benson land, and this tended to strengthen the other testimony offered to locate the line 1 to S. But when it is admitted that the Watson grant embraced within its limits the land in dispute, if the Blount patent did not include it, would a possession of seven years under the Smallwood deed and the will of Thomas Gibbs as color mature the title of the defendant to such portion of the territory covered by the deed as was included within the lappage on the Watson grant? It was admitted that the defendant did not occupy the land in dispute north of the line T to 8 before 1867, nor for the period of twenty-one years, when the statute was running after that time; so that in the contingency mentioned the defendant must rely upon showing title out of the State by the grant to Watson and in himself by possession for seven years under color of title. If prior to 1867 the plaintiffs or those under whom they claim were in the actual possession of any portion of the Watson grant outside of the lappage (which, if the Smallwood deed extended to the line 1 S, would be identical with the *locus in quo*) and the defendant was in the occupation of some portion of the land embraced in the Smallwood deed but south of the disputed land, the law would, while such was the status, give the constructive possession of the entire lappage to those holding under the grant, which was the older title, as it would so long as neither party entered and occupied under his title. *McLean* v. *Smith*, 106 N. C., 172. "If one be seated on the lappage and the other not the possession of the whole interference is in the former." *McLean* v. *Smith*, *supra*; *Williams* v. *Miller*, 7 Ired., 186. There was evi-

dence tending to show that the defendant had entered upon
the lappage in 1867 and had since such entry occupied and
cultivated some portion of it for more than seven years
when the statute of limitations was running. So long as
the defendant was seated on it and the plaintiff was not, the
possession of the whole lappage was constructively in the
defendant if it was embraced in his deed, because the
moment he crossed over the plaintiff's line his purpose to
claim adversely was unmistakable and his liability as a
trespasser to one having a better title was unquestionable.
The law therefore would attach the usual penalty for the
laches of the plaintiff in failing to maintain his right by an
action. *Williams* v. *Miller, supra; Osborne* v. *Johnson,* 65
N. C., 26. If the plaintiff during the time when the defend-
ant so occupied the lappage had also been seated on it, the
better title would have drawn to the former the constructive
possession of all of the interference except so much as was
embraced within the actual enclosure of the defendant.
Until the defendant crossed the south line of the lappage,
however, and made himself a trespasser upon the territory
embraced within the Watson grant the plaintiffs could
maintain no action against him, because he might have
shown good title up to their line and that he had not ven-
tured beyond. Though as a rule a man is presumed to
claim to the outside boundaries of his paper title (*McLean*
v. *Smith, supra; Ruffin* v. *Overby, supra*), yet that pre-
sumption does not disturb the constructive possession
of one holding by superior title. The sufficiency of
possession to mature title depends upon the liability of
the occupant to an action of trespass. "This is the test."
*Osborne* v. *Johnson, supra.* It would be hard measure if the
defendant could, by a possession for seven years south of
the *locus in quo,* acquire title to the lappage, which is the
*locus in quo,* without incurring liability as a trespasser upon

BOOMER *v.* GIBBS.

it. Where the boundaries of two grants or deeds lap upon each other the constructive possession of his entire boundary remains in him who has the better title, even without any actual possession whatsoever, until the claimant under the junior grant occupies the lappage. When such claimant enters into the exclusive occupation of the interference he extends his constructive possession to the outside limits of his deed, but if the grantee under the older title seat himself upon it at any moment before the end of the statutory period, he in turn extends his constructive possession to the whole interference, except the *possessio pedis* of the other. If the defendant had entered upon the land in dispute and held adversely so as to subject himself constantly to an action his title would have matured in seven years, since he could have availed himself of the plaintiff's grant to show title out of the State. *Gilchrist* v. *Middleton*, 107 N. C., 663.

We think that the learned Judge who tried the case below erred when he instructed the jury that a possession south of the line 8 B for seven years was sufficient to ripen defendant's title under the Smallwood deed. It is perhaps well to add, in view of the fact that the point may be raised on another trial, that the map offered was not competent as evidence *per se*, but could be used by a witness under examination to explain and elucidate his testimony. *Dobson* v. *Whisenhant*, 101 N. C., 645. For the error in the instruction given as to the effect of a possession south of the line 8 to B and in refusing the instruction asked upon the same subject a new trial is granted. New Trial.