MRS. LAURA A. PATRICK v. JEFFERSON STANDARD LIFE INSURANCE COMPANY AND COUNTY OF GUILFORD.

(Filed 11 December, 1918.)

1. **Deeds and Conveyances—Alleys—Appurtenances—Adjoining Lands—Adverse Possession—Evidence—Questions for Jury.**

The owner of land within the limits of a city conveyed a part thereof to P and G., along which was an alley, and afterwards another part to the county for a courthouse square, leaving the alleyway to connect with part of the land he had then retained, with provision in the deed to P. and G. leaving one-half, or 4 feet, of this alley adjoining the P. and G. land "in the seizure of" the grantor, with covenant that it should be continuously left open as a passway for himself and the said P. and G., and which should not be obstructed "by him or any other person." Thereafter, the county acquired all of these lands, and among other things done on the alley, it enclosed the alley with a fence, planted trees, grass, rose bushes, etc., thereon, and the county and its grantee, the defendant in the action, held the alley as part of the courthouse square for a period of fifty years: *Held,* sufficient evidence of adverse possession to ripen the defendant's title in the alleyway; and, further, the intent of the covenant in the deed, under which the plaintiff claims with respect to the alleyway, was to reserve it for the benefit of P. and G. and of himself and his heirs, and passed under the *habendum* as an appurtenance to the adjoining land since acquired by the defendant's grantor.

2. **Limitation of Actions — Adverse Possession — Evidence — Questions for Jury—Trials.**

The use and occupation of land, as from its nature and character it is capable of, dealt with so as to indicate an assertion of ownership, in opposition to the world, or its true owner, openly and notoriously, under a claim of right, and known and visible boundaries, or color of title defining its boundaries, is sufficient evidence of adverse possession, if continued in for the statutory periods applicable, to ripen the title in the person thus claiming it.

3. **Deeds and Conveyances—Alleys—Appurtenances—Evidence—Extraneous Circumstances.**

Observing the strict requirement that in construing conveyances of land the intention of the parties is first to be ascertained from the language employed in the written instruments, regarded as a whole, the courts may regard the surrounding circumstances, in appropriate instances, in ascertaining their intent, and adopt the interpretation which conforms more to the presumed meaning; and where it clearly appears that a grantor of lands has covenanted that an alleyway be kept open for the convenience of his grantee, and of himself and his heirs, in regard to the adjoining lands, and also to afford an outlet to a part of his lands lying at the inner end of the alleyway, and that he has subsequently sold all the remainder of the land adjoining, the court may view the whole transaction and its attendant circumstances to ascertain the intent of the grantor as to the alley; and where the purchaser from him, and those claiming in succession to him, have acquired the whole of the original tract and used it adversely and notoriously, under a claim of right, for more than twenty years, without objection from any one, it is sufficient to vest the title in the defendant, the last purchaser.

4. **Deeds and Conveyances—Alleys—Title—Merger.**

Where an alleyway has been reserved in a deed to lands as appurtenant to their use, and the grantee has acquired the remainder of the lands, in fee, the easement, a subordinate and inferior derivative right, is merged in the fee-simple title.

5. **Appeal and Error—Verdict—Judgments—Issue—Answers.**

Where the verdict of the jury has been adverse to the appellant upon two issues, either one of which is determinative of the controversy, the judgment accordingly rendered upon one of them alone will not be disturbed on appeal.

ACTION, tried before *Adams, J.,* and a jury, at March Term, 1918, of GUILFORD.

The suit was brought to quiet the title to a certain parcel of land in the city of Greensboro west of and adjoining the courthouse lot, or square, being 4 feet wide and extending from West Market (formerly Main) Street 87 feet and 10 inches north from said street, it being the western half of an alley which lay between the courthouse square (sold by Solomon Hopkins to the county) and the brick building known as

the Patrick or Porter & Gorrell storehouse, the other, or eastern, half of the alley being part of the said courthouse lot, "the middle line of the alley being identical with the western line of the original courthouse lot. Plaintiff claims that 4-foot strip, or western half, of this 8-foot alley as devisee under the will of her husband, Thomas J. Patrick, who acquired title to the front portion of the lot, next width of this alley, from Dr. I. J. M. Lindsay, and conveyed it to Porter & Gorrell, who conveyed it to the county, as far back as 1872 or 1873.

The deed from Patrick to Porter & Gorrell, dated 13 July, 1862, contained this provision, leaving the western half of the alley, or the 4-foot strip along the eastern side of the storehouse, "in the seizure of said T. J. Patrick," which he covenanted, for himself and his heirs and assigns, should continually be left open as a passway for himself and the said Porter & Gorrell, and should never be obstructed by him or them or any other person. The lot in the rear, or north of the one just described, was also owned by Patrick, and this he conveyed to W. A. Caldwell, who, in his turn, conveyed it to the county of Guilford. This lot also fronted on the 8-foot alley, and in the deed of Caldwell to the county the easement in the alley is mentioned. The county also purchased from Ralph Gorrell the lot north of and adjoining the last named, or Caldwell lot. The county also purchased lots from Hinton and Staples north of and adjoining the Gorrell lot and the courthouse square, on which the courthouse stood. The county by its several purchases many years ago, between 1870 and 1875, acquired title to all of the land, except West Market Street, which surrounded the parcel of land, or 4-foot strip, now in controversy.

The county of Guilford was made a party defendant, upon its own request, in order to protect its covenants of title in the deed to its co-defendant, the Jefferson Standard Life Insurance Company, and any other interest it has in the cause.

The court charged the jury fully upon all the questions raised in the case, as far as it was necessary to do so, and especially upon the evidence as to the adverse possession of the defendants and its effect upon the issues. The jury returned the following verdict:

1. Does the defendant, the Jefferson Standard Life Insurance Company, claim to be the owner in fee simple of the land described in the complaint and in controversy under and by virtue of the deeds executed to it and the mesne conveyance for said property? Answer: "Yes."

2. Have the defendant and those under whom it claims been in the open, notorious, adverse and continuous possession of the land described in the complaint and in controversy for a period of twenty years before the commencement of this action up to known and visible metes and bounds? Answer: "Yes."

3. Is the plaintiff the owner in fee of the land described in the complaint and in controversy? Answer: "No."

Judgment was entered upon the verdict for defendants, and plaintiff appealed.

*Alfred S. Wylie and R. C. Strudwick for plaintiff.*
*John S. Wilson and Brooks, Sapp & Kelly for defendants.*

WALKER, J., after stating the case: The plaintiff claims that by reason of the words of reservation in the deed of her husband, T. J. Patrick, to Porter & Gorrell, and the will of her husband, which devises all his real estate to her, she is now the owner of the 4-foot strip of land before described, while defendants claim that no such reservation was intended by Thomas J. Patrick, his only object being to afford him and Porter & Gorrell an outlet to West Market Street, and that when there was no longer any necessity for this use of the alleyway it passed by clear intendment of Patrick to the county at the time it acquired the surrounding land, and, besides, that if the plaintiff or her husband had any legal right to the strip it has been lost by adverse possession or adverse user for more than twenty years. It also contends that as the lot conveyed to Porter & Gorrell by Patrick was next to the alley, one-half of which the latter owned at the time of the conveyance, the eastern boundary of the grantees extended to the middle of the alley, under the description in the deed, which would take in the 4-foot strip of land now in dispute, subject to the easement or right of way over it of Porter & Gorrell, and Patrick himself, who were the holders of the dominant tenements. And it is further contended by defendants that, considering the deeds in evidence and the undisputed facts, Patrick never intended to reserve the legal title to the 4-foot strip, but merely to create an appurtenant easement in favor of the adjoining tenements, and that if he intended to retain the title it was only to remain in him so long as was necessary to protect the easement, and when this necessity ceased the strip should become a part of the lots sold and which bordered upon it, each receiving its pro rata share, or the part of the alley in front of it. But in this connection they do not admit that the 4-foot strip was ever intended to be severed from the Porter & Gorrell lot, but that the effect of the deeds was to reserve to T. J. Patrick such a control over the 4-foot strip as would enable him to create and preserve an easement, or right of way over it, for the benefit and more convenient enjoyment of the Porter & Gorrell lot and his own lot in the rear, or north of it, which he afterwards sold to W. A. Caldwell, who still later conveyed it to the county.

. The judge, by consent, was given the right to answer the third issue
after the verdict upon the other issues was returned by the jury, and
when the verdict was announced he caused the following entry to be
made: "Apart from the answer to the second issue, I am of opinion
that when the county of Guilford acquired title to the lots there was a
merger of the easements, and if an easement was revived when the
county conveyed to the Jefferson Standard Life Insurance Company, it
was revived only for the benefit of the owners of the fee, neither of
whom seek to take advantage of it. There are other reasons that need
not to be stated. I answer the third issue 'No.'"

We are of the opinion, after examining the record with care, that
there was evidence fit to be submitted to the jury upon the question of
adverse possession within the established rule as to what will constitute
such a possession. The evidence tends to show that the space between
the courthouse and Barker & Sockwell's store has been a part of the
courthouse square since between 1872 and 1875, when the county bought
the property for the purpose of having a square upon which to build the
new courthouse, and that this space was ploughed up and sown in grass,
and that trees were planted there, and a wire fence built across the space
at different times to keep intruders out. Rose bushes were set out and
the property was considered as belonging to the county, and so used.

The witnesses W. H. Green, W. G. Balsley, and W. H. Ragan testi-
fied that since the year 1874 or 1875 the open space west of the course,
which includes the disputed strip of land, has been a part of the court-
house square, and so used by the county and the public, and W. H.
Ragan further testified: "From the time I have known this property,
either officially or unofficially, there has never been an alleyway or
walkway leading from Market Street, running parallel with the court-
house going north and south next to the building, until the cement walk-
way was put down. Think the cement walkway was put down in 1900.
It runs from the west side of the courthouse over to the walk running
the other way along by Barker & Sockwell's place. Then there is
another cement walk. Neither one of these walks run immediately
along the courthouse running north and south. One runs from the
courthouse west and the other straight across, going next to Barker &
Sockwell's building. They meet in front of the office building. At no
time when I was a member of the board, or its chairman, did the plain-
tiff in this case or testator, Mr. T. J. Patrick, ever make any claim to
any portion of the property, or ask to pass over it."

The witness, W. H. Ragan, was for many years a member of the
board of commissioners of the county and its chairman for seven years.

The plaintiff's witness, David Scott, testified: "The fence extended
entirely up and covered the space to the courthouse building. It went

within a few feet of Barker & Sockwell's store. It included Patrick's drug store. I don't know just how close it went to Patrick & Sockwell's store. It included all the open space. After the fence went down this property was plowed up and sown in grass several times. After the first fence rotted down there were small posts put up and wire stretched across that in the same territory where the original fence was. This prevented any passage from West Market Street into the open property west of the courthouse except by persons who would get over the fence and go in."

There was much other testimony showing that the county was claiming to be the owner of this property as a part of the courthouse square, and that it was occupied and treated as such without any claim of title or ownership by the plaintiff until about the time that this suit was commenced.

Where there is such use and occupation of land as from its nature and character it is capable of, and it is dealt with in such a way as to indicate that the occupier is asserting the right of ownership over it in opposition to the world or to the true owner, and this is done openly and notoriously under a claim of right and under known and visible boundaries or color of title defining its boundaries, it is such adverse possession as, if continued for the statutory period—seven years under color and twenty years without color—will ripen the title to land if the State has parted with or lost its right and title to the same. It does, in the law, mean that the person must have his feet on every square foot of ground before it can be said that he is in possession. It may be established by inclosure, by the erection of buildings or other improvements, by cultivation, or, in fact, by any use of it that clearly indicates the appropriation and actual occupancy of a person claiming to hold it. The following cases support this view and state with fullness the nature of adverse possession as understood in this jurisdiction: *Christman v. Hilliard,* 167 N. C., 4, at p. 7; *Bryan v. Spivey,* 109 N. C., 57; *Boomer v. Gibbs,* 114 N. C., 76; *Vanderbilt v. Johnson,* 141 N. C., 370; *Simmons v. Box Co.,* 153 N. C., 257; *Ray v. Anders,* 164 N. C., 311; *Dobbins v. Dobbins,* 141 N. C., 210; *Berry v. McPherson,* 153 N. C., 4; *Locklear v. Savage,* 159 N. C., 236; *Coxe v. Carpenter,* 157 N. C., 557.

It was held in *Berry v. McPherson, supra,* that "While the evidence of title by adverse possession must tend to prove the continuity of possession for the statutory period in plain terms or by 'necessary implication,' it is sufficient to go to the jury if it was as decided and notorious as the nature of the land would permit."

The possession here was, as decided, notorious and continuous as the nature of the land would permit, and offered unequivocal indication that the defendant and those under whom it claims were exercising the

dominion of owners, and were not pillaging as trespassers by occasionally going upon the land for special purposes, and not in the assertion of a general ownership, but were using the same and making continual claim thereto. The defendant and those under whom it claims were exposed to suits, either at law or in equity, though the plaintiff mistakenly supposed they were not. *Boomer v. Gibbs,* 114 N. C., 76; *Osborne v. Johnson,* 65 N. C., 22; *Christman v. Hilliard, supra.* See, also, on the question of adverse possession, *Reynolds v. Palmer,* 167 N. C., 454; *Williams v. Buchanan,* 23 N. C., 537, and other cases cited in 167 N. C., at 455.

The inference from this record is that the plaintiff has never claimed ownership by paying the taxes on the property. It is a circumstance, if it existed, to be considered by the jury, though not a decisive one. *Christman v. Hilliard, supra,* and other cases cited on the point. For the law in other jurisdictions, see 1 Cyc., 984, 985, 987, 998, 999, and notes to the text.

But there is another ground upon which the plaintiff must fail. It is manifest from the entire case and a proper construction of the respective deeds that Mr. Patrick never intended to sever the strip from the lots he conveyed and to retain title to it as separate and distinct from the other land. His clear intention was to retain control over the strip for the purpose only of protecting the right of way over it for the use and benefit of the Porter & Gorrell lot and the one he owned adjoining and to the north of it. We have the right, when interpreting a transaction like this one, in order to ascertain its nature and purpose, to take into consideration the object and motive of the parties, or what they intended to accomplish, as shown by the several deeds for the property in dispute, and to survey the situation as a whole.

Mr. Patrick owned a lot back of the one he sold to Porter & Gorrell, and he desired an exit from it to West Market Street. It was necessary for the better and more convenient enjoyment of his tenement, and the same is true as to the lot he sold to Porter & Gorrell. These lots bordered on the alley and adjoined that part of it which he reserved as the right of way. As he owned that half of the alley, the fee in it, if nothing was said to the contrary, would have passed with the lots conveyed by him to Porter & Gorrell and to W. A. Caldwell. The following cases state and illustrate the principle:

"A conveyance describing a lot in a deed as bounded by an alley which is laid off on a certain plat will pass title to the center of the alley if the grantor's title extended so far, and it is immaterial whether or not the alley is ever brought into public use." *Jacob v. Woodfolk,* 90 Ky., 426.

"A conveyance of land bounded along a certain lane which was laid out entirely on the grantor's land, but on a margin thereof, carries the fee in the whole road-bed, and especially where all the land bordering on the lane was conveyed." *Haberman v. Baker,* 128 N. Y., 253.

"Where an alleyway (owned by the grantor) was laid out on the extreme edge of a lot, a deed conveying it and referring to it in the general description by reciting its number was held to carry the bed of the alley, notwithstanding the alley was referred to in the particular description as the boundary of the lot. If the owner of the land conveyed in two parcels, describing them as the northern and southern halves by metes and bounds, and as bounded southerly and northerly, respectively, by an alley, and such metes and bounds would establish an alley between them, while the strict division into halves would make the center line of such alley the division line between the parcels, the deeds should be so construed as to vest in each grantee title to the center of the alley." *Albert v. Thomas,* 73 Md., 181; *F. P. Church v. Kelar,* 39 Mo. App., 441.

Of course, if the grantor does not own the bed of the alley, or the part of it on his side, the deed would not operate so as to pass any part of the fee in the alley, but would stop at its boundary. The clear intention here was to convey to the center of the alley with Patrick's one-half of the alley burdened with the right of way given by the deed. Mr. Patrick could derive no benefit from his half of the alley except by using it for the purpose of an exit from his lots and Porter & Gorrell's lot. When Patrick comes to make a deed to the third lot on which the northern end of this alleyway abutted he made no reference to reserving any alleyway, or rights or title therein, as this was the only property owned by him in the block. Hence after conveying it up to the line of the old county square, he, by the habendum clause in the deed, vests in the grantee whatever rights might attach to this lot by his ownership on account of the reservation of easements and rights of way in the Porter & Gorrell lots. The provision in the deed "to have and to hold, together with all appurtenances and privileges thereunto in any wise belonging and appertaining, unto him in fee simple," etc., disposed of the last and remaining interests which he had in any land or easements in said square.

A case strikingly similar to the one at bar, in which a lot was conveyed bounded by an alleyway, and a reservation of the alleyway was provided for, as in this case, is *Hennesy v. Murdock,* 137 N. Y., 317 (33 N. E. 330). The Court there says: "Where the owner of a square divides it into two lots with an alley through the center, and conveys a lot bounded on the alley, 'together with the right of way of the alley aforesaid, which is forever to be kept open for the benefit of the lot,

and conveys the lot on the opposite side of the alley and bounded thereon to another grantee, the grantees take the fee to the center of the alley."

The express uses for which Patrick retained certain rights in the alleyway are nothing more than easements appurtenant to the lots; hence when the lots were sold the appurtenant easements went with them and no estate was left in Patrick such as would enable him, after a long residence in Virginia, or his devises nearly thirty years after his death, to assert against the county, which had been in open and notorious possession of both the lots and the strip of land for nearly fifty years.

In Jones on Easements, sec. 28, the doctrine is stated as follows: "An appurtenant easement cannot be conveyed by the party entitled to it separate from the land to which it is appurtenant. It can be conveyed only by a conveyance of such land. It adheres in the land and cannot exist separate from it. It cannot be converted into an easement in gross."

We find cases similar to this one in the books, where a like construction was placed upon the deeds. "After a highway had been laid out and established pursuant to law, the owner of the land conveyed the same with the usual covenant of warranty and seisin, saving and excepting the said highway. It is held that the right of soil in the highway had vested in the grantee, subject to the right of passage to the public." *Tuck v. Smith,* 1 Conn., 103.

"There is no rule of the common law better settled and more universally adopted in this country than that which prescribes that a grant of land bounded in general by a creek or river not navigable carries the land to the grantee *usque ad filum aqua*—to the middle, or thread, of the stream." *Rowe v. Lumber Co.,* 128 N. C., 301, and 133 N. C., 433.

In *Smith v. Goldsboro,* 121 N. C., 350, in discussing a similar question, the Court says: "In other words, he opens streets to induce parties to purchase lots, which they could not have done had not the streets been opened. While he may ·have retained the fee of the streets, inasmuch as he did not convey it to any one, he could not have expected any personal benefit therefrom as he now is not even an abutting owner, as appears from the record. He ·was fortunate in being able to dispose of all his lots at prices presumably satisfactory to himself. This, which would otherwise have been impossible, he was able to do by opening the streets in controversy, and he should not now be heard to assert any ownership in said streets to the injury of the parties whom he thus induced to purchase."

The last case, decided by this Court, is very much in point. Mr. Patrick opened the alley, with the county, to render his lots salable by creating an easement appurtenant over the alley, for the purpose of accessibility to the street, without the intention, though, of ever claiming

any interest otherwise in the alley, and dedicating it solely to that purpose. When the dominant tenements were purchased by the county and made a part of the square surrounding the courthouse, the right of way was no longer needed, and was thereby extinguished, and the servient tenement, if we may so call it, or the strip of land which was used as a way to the street, was merged into and became a part of the square. When he reserved the "seizure" of the strip he simply meant that the fee should pass to his grantees, subject to the right of way, and in order to preserve this easement intact to him and his assigns he should have control of the strip so long as necessary for that purpose. This is the interpretation given to similar conveyances in the cases we have before cited.

We would not impute to Mr. Patrick the motive in making the reservation, that he did so for the purpose of annoying and harrassing his neighbors by excepting from his conveyance the fee of a narrow strip of land which, without the easement, could be of no conceivable benefit to him, and holding it so that he could exact a high and unreasonable price for it from them. It would have no value to him after he had sold his lots, save for such an unworthy purpose, which should not be attributed except upon such convincing proof as to make the inference inevitable. He had a more benevolent end in view. It is strange, too, as an additional reason for our construction, that so long a time—nearly one-half century—should elapse before any claim is made to this property. The deeds from W. C. Porter and the one from W. A. Caldwell to the county of Guilford were executed in February, 1873, the Gorrell deed to the county in 1873, the deed of Patrick to Gorrell in 1871.

As illustrating, and we think strongly emphasizing, the purpose and intention of Patrick in making the reservations in the deeds above referred to, and also as showing the interest which he understood was reserved to him thereby, we may well refer to his own conduct. After conveying the third lot at the end of the alleyway in the block to Porter in 1871, there is no evidence that Patrick ever exercised any ownership or control over the strip in question, or sought to do so, and although he lived for twenty years thereafter he never sought to assert any claim to the strip in question or objected to the county's plowing it, planting the square in trees, and fencing it off, as a part of the square, from the street, and even after his death nearly thirty years elapsed before any one representing his estate conceived the idea of ownership in said strip of land. This recent claim was evidently founded upon a mistaken apprehension as to the nature and extent of Patrick's right in this 4-foot strip of land.

A very similar effort was made in the case of *Casserly v. Alameda Co.,* 153 Cal., 170, where an action was brought to quiet title of a fractional

interest in certain public squares which had been in the open and notorious possession of the city for more than twenty years. The Court took occasion to say that indisputably the claim of plaintiff was barred by the statute of limitations. The evidence in this case clearly shows that the defendant insurance company and the county, from which is acquired title, have been in the open and notorious adverse possession and control of this strip of land for nearly fifty years. There were ample facts to sustain the jury's verdict upon the second issue, which of itself disposes of plaintiff's right to recover in this action. The court's determination of the law upon the third issue, without regard to the jury's finding upon the second issue, was correct, and if either conclusion is right, the judgment below should stand.

The presiding judge alludes to a merger of the easements. A merger, technical or ideal, takes place when the owner of one of the estates, dominant or servient, acquires the other, because an owner of land cannot have an easement in his own estate in fee, for the plain and obvious reason that in having the *jus disponendi*—the full and unlimited right and power to make any and every possible use of the land—all subordinate and inferior derivative rights are necessarily merged and lost in the higher right. 14 Cyc., p. 1188; *Barringer v. Trust Co.,* 132 N. C., 409.

We are permitted to scan the entire field of inquiry and to consider the transaction as a whole and with reference to all its parts in order to ascertain the true meaning of the grantor. *Gudger v. White,* 141 N. C., 507; *Triplett v. Williams,* 149 N. C., 394; *Beacon v. Amos,* 161 N. C., 357; *Brown v. Brown,* 168 N. C., 4; *Mining Co. v. Lumber Co.,* 170 N. C., 273.

Courts are always desirous of giving effect to instruments according to the intention of the parties so far as the law will allow. It is so just and reasonable that it should be so, that it has long grown into a maxim that favorable constructions are put on deeds. *Kea v. Robinson,* 40 N. C., 373; *Rowland v. Rowland,* 93 N. C., 214.

*Chief Justice Taylor* expressed this idea when he said that the very purpose of the law would seem to be to ascertain with more particularity what it was apprehended might not have been otherwise sufficiently described. *Campbell v. McArthur,* 9 N. C., 38. It may be taken as settled that courts will, for the purpose of ascertaining the intention of the parties, endeavor to place themselves in the position of the parties at the time of the conveyance. *Cox v. McGowan,* 116 N. C., 131, 133, and *Justice Connor* in *Modlin v. R. R. Co.,* 145 N. C., 229. It all is bottomed upon the ancient maxim that contemporaneous exposition is the best and strongest in law. (*Contemporanea expositio est optima et fortissima in lege.*) Our best and surest guide, therefore, in construing

instruments is found in referring to the time when, and the circumstances under which, they were made. Broom's Legal Maxims (6 Am. Ed.), star page 654. It is not difficult, by reading the deeds and considering the attendant circumstances, to reach a satisfactory conclusion as to what the parties meant, and we are required by the settled canon of construction so to interpret them as to ascertain and effectuate the intention of the parties. Their meaning, it is true, must be expressed in the instruments, but it is proper to seek for a rational purpose in the language and provisions of the deed and to construe them consistently with reason and common sense. If there is any doubt entertained as to the real intention, we should reject that interpretation which plainly leads to injustice and adopt that one which conforms more to the presumed meaning, because it does not produce unusual and unjust results. All this is subject, however, to the inflexible rule that the intention must be gathered from the entire transaction "after looking," as the phrase is, "at the four corners of it." If we adopt this course, which is strongly commended to us, we can easily see that Mr. Patrick had no idea of retaining any title to the land except for the purpose of the easement, and then so long only as it lasted.

There was no error in the trial, and the judgment must stand.

No error.